## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHRISTOPHER RIST,
    Plaintiff,

    vs.

THE HARTFORD LIFE AND
ACCIDENT INSURANCE CO., et al.,
    Defendants.

Civil Action No. 1:05-cv-492
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001, *et seq*. ("ERISA"). Plaintiff asserts an ERISA claim for benefits under 29 U.S.C. § 1132

(a)(1)(B) against Hartford Life and Accident Insurance Company ("Hartford") and Sovereign

Specialty Chemicals, Inc. Group Disability Income Plan. Plaintiff contends that Hartford's

termination of his long-term disability benefits and waiver of premium benefit under the terms of

his employer-sponsored plans violates ERISA.[1] This matter is before the Court on the parties'

cross-motions for judgment on the administrative record (Docs. 69, 71), and their respective

opposing and supporting memoranda. (Docs. 72-75).

### I. FINDINGS OF FACT

Plaintiff was formerly employed by Imperial Adhesives, a subsidiary of defendant

Sovereign Specialty Chemicals, Inc. ("Sovereign"). By virtue of his employment with Imperial

Adhesives, plaintiff elected to participate in Sovereign's group long-term disability plan (LTD

---

1. Plaintiff initiated this action on July 7, 2005, in the Hamilton County Court of Common Pleas against alleging breach of contract and breach of the duty of good faith and fair dealing under Ohio law. Hartford removed the action to federal court on July 21, 2005, and argued that plaintiff's claims were covered by ERISA. (Doc. 1). This Court agreed and determined that plaintiff's state law claims for breach of contract and bad faith are preempted by ERISA. (Docs. 42, 46). Plaintiff subsequently filed an amended complaint alleging violations under ERISA. (Doc. 55).

Plan) and life insurance benefit policy. The LTD Plan and life insurance policy were issued and insured by Continental Casualty Company ("CNA"). (AR 41-73, 285-306).

### A. The Life Insurance Benefit and LTD Plan

The life insurance policy (AR 041-073) contains a waiver-of-premium provision under which the life insurance continues "without premium charge during the continuance of your Total Disability." (AR 053). The life insurance policy defines "Total Disability" to mean that "as a result of injury or sickness, You are unable to perform each of the material duties of any Gainful Occupation." (AR 069). "Gainful Occupation," in turn, is defined as "the performance of any occupation or employment for wages, remuneration or profit, for which You are reasonably qualified by education, training or experience." (AR 068).

The LTD Plan provides that the insurance company "will pay the Monthly Benefit for each month of Total Disability which continues after the Elimination Period." (AR 299). The LTD Plan defines "Total Disability" to mean that throughout a 180-day elimination period, and for the first 24 months, an "Insured Employee, because of Injury or Sickness, is: (1) continuously unable to perform the substantial and material duties of the Insured Employee's regular occupation; (2) under the regular care of a licensed physician other than the Insured Employee; and (3) not gainfully employed in any occupation for which the Insured Employee is or becomes qualified by education, training or experience." (AR 299).

After the monthly benefit has been paid for 24 months, the definition of "Total Disability" changes to mean that "because of Injury or Sickness, the Insured Employee is: (1) continuously unable to engage in any occupation for which the Insured Employee is or becomes qualified by education, training or experience; and (2) under the regular care of a licensed

2

physician other than the Insured Employee." (AR 299). Monthly benefits payable under the LTD Plan are reduced by any award of Social Security Disability benefits. (AR 293).

### B. Plaintiff's Initial Claim for Benefits

Plaintiff worked as a Color Lab Chemist for Imperial Adhesives for 28 years. In 1993, plaintiff was diagnosed with colon cancer. (AR 688). Plaintiff underwent a right hemicolectomy (the removal of the right half of his colon and attachment of the small intestine to the remaining portion of the colon) (also known as "short gut"). (AR 681). He was treated with abdominal radiation and chemotherapy (AR 681), then returned to work. He continued to be followed by his oncologist, Dr. Cynthia Chua. (AR 611, 718, 720).

Following his surgery, plaintiff developed gastrointestinal and scar pain, diarrhea, and bowel control problems, which became more severe as time passed. Dr. Chua referred plaintiff to Dr. Howard Decktor, a gastroenterologist. (AR 611). By 1999, Dr. Decktor performed multiple panendoscopies, colonoscopies, and polypectomies. (AR 468-70, 474, 478-81). On each examination, Dr. Decktor reported periumbilical pain over plaintiff's scars, diarrhea, and heartburn. *Id.* Dr. Decktor opined that plaintiff's diarrhea was "probably due to bile acids being mal-absorbed and going directly into the colon." (AR 480). Both Dr. Decktor and Dr. Chua reported repeated complaints of epigastric pain, diarrhea with increased frequency and pain, nausea, and incontinence. (AR 611-620, 625-30, 633, 651-52, 681-82).

In 2002, plaintiff's gastrointestinal problems associated with his post-cancer surgery became so severe that he was no longer able to travel to customer work sites. (AR 221). In December 2002, plaintiff underwent a CT scan of his right upper quadrant due to pain. Dr. Chua noted that plaintiff continued to experience right upper quadrant abdominal pain, diarrhea, and

gaseousness on a daily basis. (AR. 461). Dr. Chua reported that "because of [plaintiff's] continued GI problems, which probably are related to complications from tumor, surgery, [and] radiation, his functional status is limited." *Id*. As an accommodation, Imperial moved plaintiff to an in-house position, and he continued to work until February 2003. (AR 227).

In February 2003, plaintiff stopped working due to severe abdominal pain, diarrhea and bowel incontinence. It was noted that due to frequent bowel incontinence and urgency he was having about 30 seconds notice to get to the toilet and carried around a bucket at work. (AR 220). He received short-term disability benefits through his employer. (AR 685, 712). His employer opined that it did not think "there is anything that can be done for clmt [claimant] to rtw [return to work] at all" and there were "no accommodations they can make for clmt to rtw or to accept him back at a lesser capacity." (AR 522, 523).

In May 2003, plaintiff applied for benefits under the LTD Plan based on colon cancer, irritable bowel syndrome, and short gut. He submitted his claim to CNA, along with the CNA-required statements and assessments from Dr. Chua, his oncologist, and his employer. (AR 672-79, 716-25). In July 2003, CNA called plaintiff and "suggested" he apply for Social Security Disability (SSD) benefits. (AR 692). Plaintiff did so a few days later. (AR 670-71). CNA requested and plaintiff signed an Agreement whereby plaintiff formally acknowledged applying for SSD benefits and agreed to pay CNA's attorney fees and expenses if he failed to repay CNA any overpayment arising from a later award of SSD benefits. (AR 683).

On August 4, 2003, CNA advised plaintiff that his claim for LTD benefits had been approved "through 09/20/2003. Your entitlement to benefits beyond that date will be determined

4

by your ongoing treatment and medical evidence from your providers." (AR 555-56). Plaintiff

received LTD benefits until September 2004. (AR 373).

In December 2003, prior to the termination of plaintiff's benefits, CNA was sold to

Hartford. As the successor company to CNA Group Life Assurance Company, Hartford

administers benefits under the LTD Plan. (Doc. 60, ¶¶3-5, 7 & 15).

In January 2004, plaintiff was interviewed by a Hartford claims manager. The case notes

state:

> Over the years he has started losing bowel control. He has only the left side of his
> colon. This is his main concern. He is concerned about bowel control. They took
> the right side of his colon (the side that takes up the moisture). He has about 30
> seconds notice from feeling he has to go to the bathroom to get to the bathroom.
>
> He always has some pain. He cannot lift anything. If he lifts something his
> incision area becomes inflamed and the pain gets beyond manageability. He
> hasn't lifted anything for years. It is an ongoing situation.
>
> He has no control over his bowels. He purges his system before he leaves the
> house. He takes Lorazepam pm - especially if he goes anywhere. He takes a
> bucket with him. He averages 1-2 mg per day.
>
> He does what he can around the house. He can do all the basic household chores;
> laundry, vacuum, dust. He indicates he is very slow. He can do grocery shopping
> if he prepares himself. He leaves his house a couple of days out of the week - the
> store is 5-10 minutes away. He spends very little time out when he goes out and
> he has to be somewhere near a bathroom.

(AR 177).

In April 2004, Hartford was notified by plaintiff's Social Security attorney that plaintiff's

request for reconsideration of SSD benefits had been denied and that a request for a hearing

before an Administrative Law Judge was filed on March 16, 2004. (AR 175). The attorney

notified Hartford that it would take 12 to 18 months before a hearing would be scheduled. (*Id.*).

5

On September 14, 2004, plaintiff was interviewed by a Hartford claims examiner regarding his activities of daily living. Plaintiff reported he cannot control his bowel movements due to half of his colon being removed. (AR 173). His medications included Protonix 40 mg., Metoprolol 50 mg., and Zocor 10 mg. once per day, and Lorazepam 1mg. one to three times per day. (*Id.*). Hartford's file notes state:

> EE has been denied SSDI at all levels. EE stated that he has a lawyer and they are awaiting a hearing from the judge.
>
> EE stated that his day consists of getting up in the am and household chores. EE stated that he is able to dust, clean, wash dishes, make the bed, vacuum, laundry -can carry the laundry basket, drive, and run errands. EE stated that when he goes out, he purges his system and takes his Lorazepam. To keep busy during the day, EE does his household chores, reads, fools around in his garage with the lawn mower, rides the lawn mower to cut the grass and trim and hedge as needed, and goes on the computer for about 5 minutes a day to check his emails. . . .
>
> DBS inquired about whether or not EE is able to RTW at a sedentary position and EE stated that he would not be able to do that since he loses control of his bowels.
>
> DBS inquired how often does EE "loses control" of his bowels and EE stated that it varies. EE goes to the bathroom up to 2-4 times a day. The urgency is sudden and when the urge hits, he has about 30 seconds to get to the bathroom. The right side of the colon was removed in which "the water comes out of the solids." EE does not wear any protection that would protect him just in case he does not go to the bathroom. The last time EE had an accident was 2 weeks ago.

(AR 175).

On September 14, 2004, Hartford submitted a "Functional Assessment Tool" form to plaintiff's treating physicians, Dr. Neack and Dr. Decktor. (AR 346, 660-62, 663-65). The form asked for the physicians' opinions regarding whether plaintiff was currently "capable of performing full time work of a Color Lab Chemist . . . ." (AR 661, 664). The form continued, "If no, please submit specific medical or clinical evidence to support this opinion." (AR 661).

Such evidence could include "office notes, diagnostic results, physical exam findings, and physical therapy summaries." (*Id.*).

Dr. Chua had previously submitted a Functional Assessment Tool form dated August 7, 2003, in which she indicated she did not believe plaintiff was "capable of performing full time work, which involves supervising and coordinating activities of personnel performing chemical and physical tests, which involves primarily standing and lifting up to 25 lbs." (AR 679).

On September 16, 2004, Hartford received an incomplete Functional Assessment Tool form from Dr. Neack's office, indicating the doctor did not perform functional capacity evaluations. (AR 172).

## C. Suspension of Claim Processing

On September 24, 2004, ten days after it had sent the Functional Assessment Tool forms to the physicians, Hartford informed plaintiff that it had not received the forms from either Dr. Decktor or Dr. Neack. (AR 550). Dr. Neack had informed Hartford that he could not complete the form because he had not seen plaintiff. Dr. Decktor did not complete and return the form. Hartford informed plaintiff that if the forms were not received by October 26, 2004, processing of his claim would be suspended and his claim file closed. (AR 550).

Plaintiff then contacted Hartford's claim representative to advise that he would contact his physicians' offices to request they complete the forms. (AR 170, 344). Plaintiff also requested that Hartford send Dr. Chua a Functional Assessment Tool form. (*Id.*). Plaintiff called Hartford several times thereafter to follow up on the requested medical information. (AR 167-169, 339-343).

Plaintiff then followed up with his physicians and had medical records faxed to Hartford.

7

(AR 609-48). Hartford received medical records from Dr. Chua (AR 342, 9:00 AM entry), a

letter from Dr. Neack (AR 342, 1:09 PM entry), 40 pages of medical records from Bethesda

Hospital (341, 4:52 PM entry), and additional medical records from the physician's office (340,

9:37 AM entry).

> Dr. Neack's letter, dated October 12, 2004, stated:
>
> I saw Mr. Rist on September 28, 2004, and we discussed his disability.
>
> He stated that he is disabled due to fecal incontinence. Since his treatment for colon cancer, he states that he has bowel movements four times a day, often more. He states that when he has to have a bowel movement, he may have as little as 15 seconds warning. He has frequent episodes of incontinence. He has been treated for this by Dr. Cynthia Chua, his oncologist, and has been evaluated by a gastroenterologist, Dr. Howard Director (sic) ["Decktor"]. Both doctors have offices in Montgomery, Ohio. I do not have medical records from either of these physicians.
>
> I have recently started him on a different medication with the intent to control the fecal incontinence. However, in my opinion, it would be extremely difficult for anyone to perform employment duties with such an uncontrolled problem.
>
> I also note that your company has not requested medical records. You have requested a work function assessment. I do general internal medicine and do not do work function assessments. Therefore, I am not in a position to evaluate his ability to lift or perform the other duties you outlined in your letter.

(AR 445).

On October 28, 2004, plaintiff also submitted a January 15, 2004 Questionnaire

completed by Dr. Chua, his treating oncologist, which confirmed his diagnoses, the residual

symptoms caused by his medical impairments, and the impact on his functional capacity. (AR

165-66, 604-608). Dr. Chua reported that plaintiff was diagnosed with Adenocarcinoma of the

ascending colon with accompanying symptoms of abdominal pain, diarrhea, bowel incontinence,

gaseousness, and bowel urgency. (AR 606). Dr. Chua opined that plaintiff's symptoms are

credible and reasonably related to plaintiff's diagnosis and clinical signs. (*Id.*). The treating

oncologist also reported that plaintiff experienced between two and twelve bowel movements per

day. (*Id.*). Dr. Chua also reported that plaintiff is subject to bowel movements with little or no

"warning" on a typical basis. (AR 607). She reported that plaintiff was prescribed Ativan to

control urgency and diarrhea, but that Ativan caused sedation as a side effect. (*Id.*). Dr. Chua

reported that plaintiff would likely miss in excess of three days of work per month due to the

exacerbation of his bowel-related problems. (*Id.*). She further reported that plaintiff would

experience frequent exacerbations at work that would cause his productivity to significantly

diminish due to the need for unexpected bathroom breaks. (*Id.*).

The same day Hartford received Dr. Chua's report, it decided to "suspend" the processing

of plaintiff's claim and close the file "due to no receipt of MR [medical records] from Dr. Neack

and no response from Dr. Decktor." (AR 165). Hartford sent a letter to plaintiff advising him:

> Per our conversation on 10/26/2004, our office advised you that we have not
> received a response from Dr. Decktor's office regarding the Functional
> Assessment Tool that was submitted on 09/28/2004. Additionally, we have not
> received a response from Dr. Neack's office regarding the letter dated 10/12/2004.
> Please be advised that Dr. Neack stated that [he] does not perform work function
> assessment and advised that Dr. Chua and Dr. Decktor are treating you for your
> condition. It is noted that he stated that you were unable to work however he did
> not submit the supporting medical documentation for review. Dr. Chua did not
> fill out the Functional Assessment Form and referred our office back to Dr. Neack
> for this information. On 10/27/2004, we received a questionnaire filled out by Dr.
> Chua that was used for by (sic) your attorney for Social Security consideration,
> however this questionnaire did not have supporting medical documentation.
>
> As of this date, we have not received the information we requested and are unable
> to continue to evaluate your claim for disability benefits. Consequently, we are
> suspending the processing of your claim.

(AR 545).

Plaintiff then retained counsel who requested that Hartford reinstate plaintiff's disability benefits and noted plaintiff's willingness to cooperate in Hartford's continuing evaluation of his claim. Counsel advised that plaintiff had not been sent the Functional Assessment Tool form and requested a copy of the form. Counsel stated that he "will promptly have a qualified practitioner carry out the test, complete your form, and it will be returned to you." (AR 602).

On November 4, 2004, Hartford sent a letter to plaintiff's counsel, enclosing a copy of the policy, the final suspension letter, and copies of the Functional Assessment Forms that had been forwarded to Mr. Rist's attending physicians for completion. (Doc. 12, AR 0049.)

Thereafter, in February 2005, plaintiff's attorney again wrote to Hartford advising it that plaintiff's treating physicians do not perform work assessments and demanding reinstatement of plaintiff's benefits. (AR 596-97).

On February 4, 2005, Hartford advised plaintiff's attorney that "there is no appeal process for a suspended claim." (AR 163). Rather, the employee must submit supporting medical evidence to document his continuing disability. (*Id.*).

On April 6, 2005, plaintiff's attorney submitted an updated report from Dr. Neack. Dr. Neack listed plaintiff's diagnoses as "colon cancer s/p resection 1993," diarrhea, and coronary artery disease. His symptoms included abdominal pain, diarrhea, bowel incontinence, gaseousness, and bowel urgency. Dr. Neack opined that plaintiff's symptoms are credible and reasonably related to plaintiff's diagnoses. Dr. Neack reported that plaintiff experienced more than four bowel movements per day with little or no warning. Plaintiff's medications included Protonix, Aciphex, Lomotil, Librex, and Imodium. Dr. Neack characterized plaintiff's pain, urgency, and frequency from his bowel-related problems as "severe," and he opined that plaintiff

10

would likely miss in excess of three days of work per month due to the exacerbation of his bowel-related problems. Dr. Neack also opined that plaintiff would experience frequent exacerbations of his combined bowel-related problems at work, which would cause his productivity to significantly diminish due to the need for unexpected bathroom breaks. Dr. Neack stated he did not have any knowledge, apart from reports from his patient, about specific tasks that are required of plaintiff at his job. Dr. Neack could not estimate a return to work date. (AR 592-595).

That same day, Hartford acknowledged receipt of the report but determined that it was not sufficient to reopen the claim file. (AR 143, 162). Hartford advised plaintiff that medical documentation (consultations, labs, diagnostic tests, etc.) were required before the claim file could be reopened. Hartford advised that "the claim file will remain in a suspended status. . . ." (AR 162).

By letter of April 12, 2005, plaintiff's counsel advised Hartford that this was the first request it had made for plaintiff's medical records subsequent to Dr. Neack's October 2004 letter, which noted that Hartford had not requested plaintiff's medical records. (AR 589-90). Counsel advised Hartford that he was in the process of gathering post-April 2004 medical records. Counsel also questioned whether the claim investigation complied with ERISA's notification requirements as the "suspension" of plaintiff's benefits was tantamount to a "termination" of his benefits. Plaintiff further questioned Hartford's right to suspend benefits under the LTD Plan upon a failure to provided updated medical records.

Thereafter, in May 2005, plaintiff submitted copies of Dr. Neack's medical records. (AR 571-88).

On June 15, 2005, Hartford advised plaintiff's attorney that it was "forwarding Mr. Rist's claim to a Medical Case Manager for review of the recently received medical records for a determination if benefits from 10/2004 are payable." (AR 122).

On June 17, 2005, Hartford sent plaintiff's attorney another letter along with a questionnaire to be completed by plaintiff "to continue the investigation on his Long-Term Disability claim." (AR 116).

On June 27, 2005, Hartford sent Dr. Neack a Medical Assessment Tool requesting the physician to answer: "From a functional standpoint, what would prevent Mr. Rist from performing full time work that is primarily seated with the ability to change positions as needed w/minimal lifting and close proximity to bathroom facilities? Please explain with medical rationale." (AR 114).

That same date, plaintiff filed suit in state court. Thereafter, the case was removed to federal court. Because it was determined that plaintiff's state law claims were preempted by ERISA, the case was remanded to Hartford to complete the administrative process. (Doc. 46).

### D. Termination of Benefits

After Hartford confirmed that plaintiff's counsel would not submit any additional information (AR 323), Nurse Patricia Laberge conducted a Medical Case Manager Assessment. (AR 321-23). She concluded that "the available medical evidence is insufficient to support an ongoing physical functional impairment since 09/20/04." (AR 322). By letter dated December 19, 2008, Hartford advised plaintiff that he did not meet the policy definition of disability beyond September 20, 2004, and that LTD benefits are not payable beyond this date. (AR 372-375).

12

Plaintiff appealed Hartford's decision. (AR 82-83). With his appeal letter, plaintiff

enclosed a copy of the Social Security Administration's fully favorable decision finding plaintiff

disabled due to diarrhea, fecal incontinence and abdominal pain:

> The claimant testified that he is experiencing increased unpredictable bowel
> movements and fecal incontinence with extreme urgency. The claimant stated
> that his bowel movements average three to six times a day and up to twelve times
> on a bad day. He testified that he is afraid to leave the house because of the risk
> of accidents; his fecal incontinence leaves him only seconds to reach a bathroom.
> The claimant states that he must plan his infrequent outings by purging his system
> the day before and taking large doses of medications or by timing his short trips to
> the store after a bowel movement.
>
> The claimant testified that scar tissue from the surgery becomes inflamed and
> prevents him from lifting or pulling, and he cannot walk more than a block. He
> stated he must slouch when in a standing or seated position to relieve the pressure
> of the scar tissue. The claimant testified that he has daily chest pain and pain
> from inflammation of his scar tissue which awakens him for a few hours every
> night. He stated he must control his diet by not eating fruits or vegetables.
>
> * * *
>
> The undersigned gives controlling weight to the claimant's treating physicians Dr.
> Chua and Dr. Neack, who opined that the claimant would experience a severe
> degree of interference in his attempt to maintain full-time employment because of
> his frequent symptom exacerbations that would cause his productivity to
> significantly diminish due to the need for unexpected bathroom breaks. * * *
>
> Dr. Parsons classified the claimant's past relevant work as a chemist as skilled
> and light in exertional demands, but performed as sedentary according to The
> Dictionary of Occupational Titles. Dr. Parsons testified that, with the residual
> functional capacity assessed, the claimant is unable to perform past relevant work.

(AR 84-93).

Hartford then referred the matter to MES Solutions for an independent medical review.

(AR 80). On September 9, 2009, a report was submitted by Dr. Albert Fuchs, Board Certified in

Internal Medicine. (AR 74-75). He concluded that the medical records did not support a finding

of functional impairment on and after September 21, 2004. (AR 75).

On September 28, 2009, Hartford denied plaintiff's appeal.  The decision states, in

relevant part:

> To briefly summarize, Mr. Rist was unable to work as a Color Lab Chemist as of
> 2/22/03 due to colon cancer and irritable bowel syndrome.  As you are aware Mr.
> Rist's benefits had been previously approved thru 9/20/04 and then were
> terminated due (sic) it was determined that Mr. Rist was no longer totally disabled
> from his occupation.
>
> The records received from Dr. Lawrence Neack indicate that Mr. Rist was seen on
> 9/28/04 at which time Mr. Rist reported that he was having 3-4 bowel movements
> per day and sometimes more often with only 15 seconds to react.
>
> In a letter dated 10/12/04 Dr. Lawrence Neack indicated that Mr. Rist was
> disabled due to stool incontinence.
>
> According to the medical records Mr. Rist was seen by Dr. Neack on 3/11/05 with
> complaints of nausea and abdominal pain.  Dr. Neack's assessment was
> abdominal pain and his HTN was stable.  On 3/15/05 Mr. Rist was seen for a
> follow up and reported that he still had epigastric pain and acid reflux.  Mr. Rist
> also reported that his loose stools were better.
>
> On 3/21/05 Dr. Lawrence Neack indicated that Mr. Rist had colon cancer s/p
> resection 1993, diarrhea s/p resection 1993 and coronary artery disease.  Dr.
> Neack also indicated that he did not feel that Mr. Rist would improve to the point
> that he could carry on normal work activities.
>
> The records indicate that Mr. Rist was seen on 5/17/05 for epididymitis.  Mr.
> Rist's blood pressure was 110/70 and his pulse was 72.
>
> As part of the appeal review Mr. Rist's claim file was sent to MES Solutions for
> an Independent Medical Review.  On 9/21/09 Albert C. Fuchs, M.D., Board
> Certified in Internal Medicine, indicated that based on his review of the medical
> information the medical records "do not support any medical problems that
> are/were causing functional impairment from 9/21/04 onward."
>
> ***
>
> We note that Mr. Rist has been approved for Social Security disability benefits.
> The Social Security Administration and The Hartford use different definitions of
> disability and different criteria for awarding disability benefits.  A decision by The
> Hartford to award benefits does not mean that the Social Security Administration
> will award benefits, and vice versa.

(AR 366). Hartford concluded that plaintiff was not precluded from performing the duties of his occupation as a Color Line Chemist beyond September 20, 2004. (AR 367).

Plaintiff's motion to reopen this case in federal court was granted on March 29, 2010. (Doc. 54). This matter came before the Court for oral argument at which both parties were heard (Doc. 77) and is now ripe for review.

## II. CONCLUSIONS OF LAW

### A. Standard of Review

A beneficiary may challenge an ERISA plan administrator's decision to terminate benefits by Court action under 29 U.S.C. § 1132(a)(1)(B). The Court must review the administrator's decision under a *de novo* standard, unless "the benefit plan in question gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-112, 115 (1989). Where the plan grants discretionary authority to the administrator, the Court must apply the highly deferential arbitrary and capricious standard to its review of the benefits decision. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). In determining the proper standard of review, the Court must look to the language of the plan at issue. *See Firestone*, 489 U.S. at 111-12.

The parties disagree on the standard of review in this case. Plaintiff contends that two different standards apply: one for the life insurance policy and one for the disability policy. Plaintiff notes that under the life insurance policy issued to Sovereign, which provided a "Waiver of Premium Disability Benefit" during the continuance of total disability, CNA reserved to itself

15

the discretionary authority to determine eligibility for benefits and to interpret the terms and

provisions of the Policy:

### DISCRETIONARY AUTHORITY

The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to Continental Assurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the Policy.

(AR 70).

Plaintiff asserts that in contrast, the LTD Plan issued by CNA to Sovereign contains no

such discretionary language. In addition to the Plan provisions that define Total Disability,[2] the

Plan provides:

**WRITTEN PROOF OF LOSS.** Written proof of loss must be furnished to Us within 90 days after the end of a period for which We are liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless the insured Employee is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

**TIME OF PAYMENT OF CLAIM.** Benefits will be paid weekly, bi-weekly, semi-monthly, or monthly, whichever applies, immediately after We receive due written proof of loss.

(AR 301-302). Plaintiff contends that because this language contains no clear grant of discretion,

the *de novo* standard of review should apply to the Court's review of Hartford's decision to

terminate plaintiff's LTD benefits. (Doc. 71 at 17-19) (citing *Hoover v. Provident Life & Acc.*

---

2. "Insured Employee, because of Injury or Sickness, is: (1) continuously unable to perform the substantial and material duties of the Insured Employee's regular occupation; (2) under the regular care of a licensed physician other than the Insured Employee; and (3) not gainfully employed in any occupation for which the Insured Employee is or becomes qualified by education, training or experience." (AR 299).

16

*Ins. Co.*, 290 F.3d 801 (6th Cir. 2002); *Cornish v. United States Life Ins. Co.*, 690 F. Supp. 581 (W.D. Ky. 2009)).

Hartford argues that the arbitrary and capricious standard of review applies in this case. Hartford contends that the language, "*due written proof of loss*" has been interpreted in three unpublished Sixth Circuit opinions as triggering the arbitrary and capricious standard of review. (Doc. 72 at 2) (citing *Fendler v. CNA Group Life Assurance Co.*, 247 F. App'x 754, 759 (6th Cir. Sept. 7, 2007); *Carpenter v. CNA, Cont'l Cas. Co.*, 96 F. App'x 993, 994 (6th Cir. 2004)*; Leeal v. Cont'l Cas. Co.*, 17 F. App'x 341, 343 (6th Cir. 2001)). Hartford also notes that the Sixth Circuit, in a published decision, has held that a requirement that proof of loss be "satisfactory" triggers the arbitrary and capricious standard of review and in support of that holding cited a Seventh Circuit case in which the plan required "due proof" of loss. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (citing *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505 (7th Cir. 1995)). Hartford also cites to several district courts within the Sixth Circuit that have held the phrase "due proof of loss" requires the arbitrary and capricious standard of review. *See, e.g., Falcone v. Provident Life & Acc. Ins. Co.*, 735 F. Supp. 2d 798, 801 (S.D. Ohio 2010) (Marbley, J.); *Glover v. National Union Fire Ins. Co.*, Case No. 07-2808, 2009 WL 3169691, at *7 (W.D. Tenn. Sept. 29, 2009); *Weather v. Mutual of Omaha Ins. Co.*, Case No. 2:08-CV-14788, 2009 WL 1620417 (E.D. Mich. June 9, 2009); *Schornhorst v. Ford Motor Co.*, 606 F. Supp. 2d 658, 664-65 (E.D. Mich. 2009); *Logan v. Unicare Life and Health Ins., Inc.*, Case No. 05-72928, 2007 WL 1760759, at *3 (E.D. Mich. June 13, 2007); *Carpenter v. CNA, Continental Cas. Co.*, 254 F. Supp. 2d 730, 736-38 (S.D. Ohio 2002) (Rice, J.). Hartford asks

17

the Court to reject the "minority" view expressed in *Cornish,* 690 F. Supp. 581, and apply the arbitrary and capricious standard of review in the instant case.

In assessing whether the specific language of the LTD Plan in this case vests Hartford with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the Court notes that an ERISA plan need not include "magic words" such as the term "discretionary" or some other specific terminology in order to vest the plan administrator with discretion. *See Hoover,* 290 F.3d at 807; *Perez,* 150 F.3d at 555. The Court's focus should be on the "breadth of the administrators' power – their authority to determine eligibility for benefits or to construe the terms of the plan." *Perez,* 150 F.3d at 555 (internal quotations and citations omitted). The grant of discretionary authority must be "clear" and "express" in order to trigger the arbitrary and capricious standard of review. *Hoover,* 290 F.3d at 807; *Perez,* 150 F.3d at 555; *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir. 1996). The provisions of an ERISA plan must be given their ordinary and plain meaning and any ambiguity in the plan language must be construed against the drafting party. *Perez,* 150 F.3d at 557, n.7 (citing *Schachner v. Blue Cross & Blue Shield,* 77 F.3d 889, 895 n. 6 (6th Cir. 1996)). Ambiguity in the legal sense requires more than a mere disagreement over the terms of the plan; it requires the terms be susceptible to more than one reasonable interpretation. *See Shelby County Health Care Corp. v. Majestic Star Casino,* 581 F.3d 355, 369 (6th Cir. 2009); *University Hospitals of Cleveland v. Emerson Electric Company,* 202 F.3d 839, 847 (6th Cir. 2000); *Perez,* 150 F.3d at 557, n.7.

The resolution of the proper standard of review to apply in this case turns on the meaning of the phrase "due written proof of loss" that is included in the "Time of Payment of Claim"

18

provision of the LTD Plan. (AR 268). There are no published Sixth Circuit cases on whether the

phrase "due proof of loss" or "due written proof of loss" conveys discretionary authority on a

plan administrator in determining eligibility for benefits. The first unpublished opinion to

address this issue was *Leeal v. Cont'l Cas. Co.*, 17 F. App'x 341 (6th Cir. 2001). In upholding

the district court's construction of the term "due written proof" as conferring discretion on the

plan administrator, the per curiam court set forth this brief rationale:

> Here, the district court relied on the plan language about written proof of loss,
> time [of] payment of claim, and particularly the phrase 'due written proof of loss.'
> The court concluded this phrase was similar to language in other cases where
> discretionary authority was found to have been conferred. It further noted that
> cases supported findings of a grant of discretion with the word 'proof' alone on
> the ground that it is a legal term of art which implicitly assumes a plan
> administrator will need to judge the evidence submitted by a claimant for its
> adequacy. J.A. 279 (citing *Bollenbacher v. Helena Chem. Co.*, 926 F. Supp. 781,
> 786 (N.D. Ind. 1996)), and noting it was relied on by this court in *Perez v. Aetna
> Life Ins. Co.*, 150 F.3d 550 (6th Cir. 1998) (en banc).
>
> After carefully reviewing the parties' briefs and hearing their oral arguments, we
> AFFIRM for the reasons more fully articulated in the district court in its order
> dated January 25, 2000.

*Leeal*, 17 F. App'x at 341.

The Sixth Circuit subsequently abrogated the rationale on which the *Leeal* decision rests

in a publish opinion. *See Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d 801 (6th Cir. 2002).

In *Hoover*, the Sixth Circuit reversed the district court's finding that plan language requiring

"written proof of loss" and "proper written proof" vested discretion in the plan administrator to

determine eligibility for benefits. The Court of Appeals determined that the district court's

reliance on *Perez* and its citation to *Bollenbacher* was misplaced. The *Hoover* court contrasted

the plan language before it with the following language found in *Perez*: "[The administrator]

shall have the right to require as part of the proof of claim *satisfactory* evidence . . . that [the

claimant] has furnished all required proofs of such benefits." *Id.* at 555 (emphasis added).

Whereas the *Perez* court found such language "clearly grants discretion to [the administrator]"

and necessitated an arbitrary and capricious standard of review, *Id.* at 557, the court in *Hoover*

determined the plan before it did not convey a clear grant of discretionary authority to the plan

administrator.  The *Hoover* plan required:

> **PROOF OF LOSS**
>
> If the policy provides for periodic payment for a continuing loss, you must give us *written proof of loss* . . . .
>
> **TIME OF PAYMENT OF CLAIMS**
>
> After we receive written proof of loss, we will pay monthly all benefits then due you for disability. Benefits for any loss covered by this policy will be paid as soon as we receive *proper written proof.*
>
> **RESIDUAL DISABILITY/RECOVERY BENEFITS**
>
> We can require *any proof which we consider necessary* to determine your Current Monthly Income and Prior Monthly Income.

*Hoover,* 290 F.3d at 808 (emphasis added).  The Sixth Circuit determined that the phrase

"written proof of loss," in itself, was insufficient to grant discretion to the plan administrator to

determine benefits.  The court reasoned:  "The policies do not expressly state that the

administrator has discretion over the determination of residual benefits, nor is there language

requiring "satisfactory" proof of a disability." *Id*. at 808.  Because the plan language did not

confer the requisite clear and express grant of discretion to the plan administrator, the *Hoover*

court held the plan administrator's decision denying residual disability benefits should have been

reviewed *de novo*.

20

Following the decision in *Hoover*, the Sixth Circuit issued two unpublished decisions which Hartford cites in support of its argument for an arbitrary and capricious standard of review. Both decisions rely on *Leeal* without any further explanation or discussion of the impact of the *Hoover* decision. *See Fendler v. CNA Group Life Assurance Co.*, 247 F. App'x 754, 759 (6th Cir. Sept. 7, 2007); *Carpenter v. CNA, Continental Cas. Co.*, 96 F. App'x 993, 994 (6th Cir. 2004). The *Fendler* court, in construing plan language requiring "due proof of . . . death," noted that the court of appeals has "repeatedly held that this 'due proof' language confers discretion on the claims administrator to determine what type of proof is 'due,' such that the court must apply the arbitrary and capricious standard of review." 247 F. App'x at 759 (citing *Carpenter* and *Leeal*). Nevertheless, the *Fendler* court determined that the standard of review issue was not dispositive in the case before it as the plaintiff would be denied benefits even under the *de novo* standard. *Id.* The Sixth Circuit in *Carpenter*, in a two paragraph decision, summarily concluded that the district court "correctly applied the arbitrary and capricious standard of review." 96 F. App'x 993, 994 (6th Cir. 2004) (citing *Leeal v. Continental Casualty Co.*, 17 Fed. Appx. 341 (6th Cir. 2001)).

Hartford is correct that district courts within and outside of the Sixth Circuit have interpreted ERISA plan language requiring "due written proof of loss" as vesting discretion in the plan administrator. *See* Doc. 72 at 2 (and cases cited therein). The courts that have relied on *Leeal* appear to equate the term "due" with the term "satisfactory" in applying an arbitrary and capricious standard of review.

On the other hand, district courts within and outside of the Sixth Circuit have interpreted the same language to hold the opposite: that the phrase "due written proof of loss" does not

21

confer discretion on a plan administrator and therefore does not permit an arbitrary and

capricious standard of review.  *See Cornish v. United States Life Ins. Co.,* 690 F. Supp. 581

(W.D. Ky. 2009); *Perrin v. Hartford Life Ins. Co.,* 616 F. Supp.2d 652, 657-60 (E.D. Ky. 2007);

*Napier v. Hartford Life Ins. Co.*, 282 F. Supp.2d 531, 534 (E.D. Ky. 2003); *Williams v.*

*Continental Cas. Co.*, 138 F. Supp.2d 998, 1007-1010 (N.D. Tenn. 2001).  *See also Mobley v.*

*Continental Cas. Co.*, 383 F. Supp.2d 80, 85-88 (D.D.C. 2005); *Rivera v. Cornell Univ.,* 297 F.

Supp.2d 412, 415-16 (D. Puerto Rico 2003); *McCoy v. Federal Ins. Co.*, 7 F. Supp.2d 1134,

1140-41 (E.D. Wash. 1998); *Meagher v. Life Ins. Co. of North America*, No. 98-246-B, 1999 WL

969274 at *3-4 (D.N.H. 1999).

     The district court in *Williams* examined language identical to that in the LTD Plan in the

instant case and determined that the plain language and placement of the phrase "due written

proof of loss" within the plan did not confer discretionary authority to CNA, the plan

administrator, to determine eligibility for disability benefits.  The court reasoned:

> The only arguably qualitative term found in regard to the proof is in the provision
> relating to the payment of claims, where the policy states that payments will be
> made once CNA receives "due written proof of loss."  However, there is nothing
> to indicate that this phrase is intended to create a qualitative standard of proof.  In
> addition, the phrase "due written proof" appears only in the provision relating to
> the time of the payment of claims and not in the provisions relating to the proof
> requirements, where an insured would expect to find any prerequisites for
> receiving benefits.  A plain reading of this provision indicates that the phrase "due
> written proof" refers to the fact that there are two ways to fulfill the requirement
> of written proof, and that benefits will be paid when either form of written proof is
> received.  There is nothing in the policy to support a reading that the singular use
> of this phrase in this provision vests discretion in the plan administrator to
> determine the sufficiency of the proof submitted by the claimant seeking benefits.

*Williams*, 138 F. Supp.2d at 1010.  Thus, the *Williams* court applied a *de novo* standard of review

to the plan administrator's denial of benefits.

In *Perrin,* the court was faced with similar "due written proof" policy language: "*Subject to due written proof of loss*, all accrued indemnity for disability will be paid monthly and any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of *due written proof*." 616 F. Supp.2d at 658.  The court acknowledged the existence of differing views of the phrase "due written proof" within the Sixth Circuit and that some courts relied on the unpublished decision in *Leeal* to find discretionary authority.  The court declined to follow *Leeal*, however, as it was based on *Perez* and *Bollenbacher*, "two cases which involve policy language much different from that seen in the plaintiff's LTD policy." *Id.* The court found more relevant and persuasive the Sixth Circuit's published decision in *Hoover*, 290 F.3d at 807, which held the terms "written proof of loss" and "proper written proof" are insufficient to satisfy the clear grant of discretion requirement.  The *Perrin* court determined that the *Hoover* rationale was equally applicable to the LTD policy at issue: "Nowhere does the plaintiff's policy state or imply that the defendant had the discretion to determine whether the plaintiff is medically disabled.  In the context of the policy as a whole, the phrase "due written proof" appears to refer more to the timing of the payment than the discretion vested in the plan administrator." *Id.* at 659 (citing *Napier v. Hartford Life Ins. Co.*, 282 F. Supp.2d 531, 534 (E.D. Ky. 2003) (finding that the word "due" in the phrase "due written proof of loss" refers "only to the timeliness of the written proof-the preceding paragraphs contain language indicating that the written proof must be 'furnished within 90 days after the commencement of the period for which the Hartford is liable.'").  The court also stated:

> Though the defendant notes that *Leeal* has been followed by district courts within the Sixth Circuit, this court is not persuaded that it should follow suit.  In one of these cases, the district court stated that, although it felt compelled to adopt the "arbitrary and capricious" standard "[p]ursuant to principles of *stare decisis*," it

23

> also indicated that it might have decided the issue differently if it were considering it "as a matter of first impression." *Carpenter v. CNA, Continental Cas. Co.*, 254 F. Supp.2d 730, 737-38 (S.D. Ohio 2002). In the other, the court also concluded that *Leeal* and "the doctrine of *stare decisis*" suggested that a policy requiring "written proof of loss" vested discretion in a plan administrator. *Willis v. ITT Educ. Servs., Inc.*, 254 F. Supp.2d 926, 935 (S.D. Ohio 2003). Neither of these cases reflects any adherence to the reasoning of *Leeal*, and, in light of *Hoover* and *Napier*, *stare decisis* neither mandates nor even suggests that *Leeal* be followed.

*Id.* at 659, n. 8.

Finally, the court in *Cornish*, after a thorough review of the competing views over the term "due proof" and its variations, determined that the *de novo* standard of review was the appropriate one in light of plan language requiring "due proof of loss must be sent to [the plan administrator." The *Cornish* court reasoned:

> U.S. Life and AIG, as experienced insurers with ample resources, had the power and the responsibility to clearly draft language that would contain an express grant of discretion sufficient to warrant the deferential arbitrary and capricious standard of review. Defendants' disability plan does not contain a clear and express grant of discretion. To the contrary, to the extent that Defendants rely upon the terms "due proof" or "due written proof," such ambiguous terms cannot, and do not, in the context of the present plan, contain a sufficiently clear, express grant of discretion to apply the more liberal standard. The Court, therefore, shall review the denial of benefits in this case under the de novo standard. . . .

690 F. Supp.2d at 592.

After careful consideration, the Court declines to follow *Leeal* and the cases which have relied on it. The problems with applying the *Leeal* decision in the instant case are threefold: First, to the extent *Leeal* relied on the district court's conclusion that the phrase "due written proof" was similar to language in other cases where discretionary authority was found, the per curiam panel fails to identify the cases, the particular language, and the rationale of those cases.

24

*Leeal*, 17 F. App'x at 341. Therefore, the undersigned is unable to determine the particular content and context of the language used in the cases relied upon by *Leeal*.

Second, *Leeal* is an unpublished decision which is not binding authority on this Court. *See In re Miller*, 377 F.3d 616, 622 (6th Cir. 2004); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 833 (6th Cir. 2000). *See also Bell v. Johnson*, 308 F.3d 594, 611 & n. 7 (6th Cir. 2002) ("It is well-established law in this circuit that unpublished cases are not binding precedent.").

Third, and most importantly, *Leeal's* rationale rests in part on a district court opinion and other cases finding a grant of discretionary authority where the term "proof" alone was sufficient to confer discretion–a rationale that has since been abrogated by published Sixth Circuit precedent in *Hoover*, 290 F.3d at 807 (rejecting district court's reliance on *Perez* and *Bollenbacher* and conclusion that requirement of "written proof of loss" implicitly granted plan administrator "discretion to review that proof and determine whether the insured qualified for disability benefits."). Thus, to the extent the *Leeal* decision rests on *Perez* and *Bollenbacher* –cases whose rationale is seemingly in conflict with current Sixth Circuit precedent in *Hoover*– *Leeal* is not persuasive support for Hartford's position on the current LTD Plan language.

The Court concludes that the Sixth Circuit's published decision in *Hoover* is more persuasive than *Leeal* in construing the LTD Plan language in the instant case. Like the plan in *Hoover*, the LTD Plan here requires that the insured submit "written proof of loss" in support of a claim for disability benefits.[3] This requirement for "written proof of loss," without more, does not contain a clear grant of discretion to the plan administrator. *See Hoover*, 290 F.3d at 808. In

_____

3. **"WRITTEN PROOF OF LOSS.** Written proof of loss must be furnished to Us within 90 days after the end of a period for which We are liable. . . ." (AR 301).

addition, the provisions governing "Time of Payment of Claims" are similar in both the *Hoover*

plan and the instant LTD Plan. The *Hoover* plan provided that payment would be made "as soon

as we receive *proper* written proof." *Id.* (emphasis added). The instant LTD Plan provides for

payment of benefits "immediately after We receive *due* proof of loss." (AR 302) (emphasis

added). Because the term "*proper* written proof" failed to evince a clear grant of discretion in

*Hoover*, likewise the requirement of "*due* written proof of loss" in the instant LTD Plan does not

contain a clear grant of discretion to Hartford. The similarity of the plan provisions in *Hoover*

and the instant LTD Plan is one factor that persuades this Court that the term "due written proof

of loss" as used in the instant LTD Plan does not confer discretionary authority upon Hartford to

determine benefits and construe the terms of the LTD Plan.

  In addition, the language "due written proof of loss" as used in the LTD Plan is

ambiguous and must be construed against Hartford in determining the standard of review in this

case. The relevant Plan language states: "**TIME OF PAYMENT OF CLAIM.** Benefits will be

paid weekly, bi-weekly, semi-monthly, or monthly, whichever applies, immediately *after We*

*receive due written proof of loss*." The language "due written proof of loss" is susceptible to two

reasonable interpretations and, therefore, is legally ambiguous.

  On the one hand, while Hartford never explains exactly what the term "due" means in the

phrase "due written proof of loss," its case citations and arguments suggest that the term "due" is

akin to the term "satisfactory" as used in *Perez.* If the term "due" is synonymous with

"satisfactory," then, according to Hartford, plaintiff must meet some qualitative threshold of

proof acceptable to Hartford before he is entitle to disability benefits.

On the other hand, the term "due" as used in the phrase "due written proof of loss," may refer "to the fact that there are two ways to fulfill the requirement of written proof, and that benefits will be paid when either form of written proof is received." *Williams*, 138 F. Supp.2d at 1010. As explained by the court in *Williams* in construing plan language virtually identical to that in the instant case:

> The policy states that an insured must file written notice of a claim within thirty days of the loss. Within fifteen days of receipt of this notice, CNA will provide the insured with a claim form. If CNA fails to provide the claim form, the policy states that 'the claimant will be considered to have met the requirements for written proof of loss if [CNA] receive[s] written proof which describes the occurrence, extent and nature of the loss.' *Thus, the policy indicates that the requirement of written proof of loss may be met either through completion of the claim form or, if the claim form is not sent by CNA, by sending a document describing the occurrence, nature and extent of the loss.* This provision does not indicate any qualitative standard that the claimant must meet under either form of proof.

*Williams*, 138 F. Supp.2d at 1008 (emphasis added).

Like the plan in *Williams*, the LTD Plan in the instant case specifies two ways a claimant can meet the "requirements for written proof of loss." (AR 267, Notice of Claim and Claim Forms provisions). Because "due written proof of loss" may be construed as meaning the two methods for meeting the requirement of written proof of loss (as in *Williams*) or as meaning the submission of proof satisfactory or acceptable to Hartford (as Hartford contends), the term is susceptible to two reasonable interpretations and therefore legally ambiguous. *See Emerson Electric Company*, 202 F.3d at 847. When, as in the instant case, the language of an ERISA plan is ambiguous, such language must be construed against Hartford, the drafting party. *See Perez*, 150 F.3d at 557, n.7.

Moreover, the placement of the phrase "due written proof of loss" in the "Time of Payment of Claim" provision of the LTD Plan, in the context of the LTD plan as a whole, says nothing about the qualitative standard of proof needed to show disability. At most, it is a timing provision explaining when benefits will be paid. There is no "clear" and "explicit" grant of discretion to Hartford in the instant LTD Plan which would warrant application of an arbitrary and capricious standard of review. Indeed, this case illustrates that Hartford (via CNA) knew exactly how to draft plan language reserving to itself discretionary authority when it so desired, as in the case of its Life Insurance policy:

> The plan administrator and other plan fiduciaries have **discretionary authority** to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated **sole discretionary authority** to Continental Assurance Company **to determine Your eligibility for benefits and to interpret the terms and provisions of the Policy**.

(AR 70) (emphasis added). There is no similar "clear" and "explicit" language in the LTD Plan and the ambiguous nature of the term "due" in the context of the LTD Plan cannot justify a finding of discretionary authority on the part of Hartford to determine benefits and interpret the plan provisions. Accordingly, the Court determines that the appropriate standard of review in this case is *de novo*. The Court shall review the termination of plaintiff's disability benefits under the LTD Plan under the *de novo* standard.

### B. Application of *De Novo* Standard to LTD Plan

*De novo* review in the ERISA context simply means a determination "whether or not the Court agrees with the administrative decision based on the record that was before the administrator." *Perry*, 900 F.2d at 966. Under the *de novo* standard of review, the Court must consider "the proper interpretation of the plan and whether an employee is entitled to benefits

28

under it." *Perry v. Simplicity Engineering*, 900 F.2d 963, 966-67 (6th Cir. 1990). *See also Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1376 (6th Cir. 1996); *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1372 (6th Cir. 1994). "[T]he role of the court reviewing a denial of benefits 'is to determine whether the administrator . . . made a correct decision.' The administrator's decision is accorded no deference or presumption of correctness." *Hoover*, 290 F.3d at 808-09 (quoting *Perry*, 900 F.2d at 966-67). The Court in a *de novo* review is required to "take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998) (citations omitted). The *de novo* standard of review applies both to factual determinations and legal conclusions of the plan administrator. *See id.* at 613.

Hartford terminated plaintiff's long-term disability benefits because it concluded that plaintiff was no longer disabled as defined by the LTD Plan. The LTD Plan defines "Total Disability" to mean that throughout a 180-day elimination period, and for the first 24 months, an "Insured Employee, because of Injury or Sickness, is: (1) continuously unable to perform the substantial and material duties of the Insured Employee's regular occupation; (2) under the regular care of a licensed physician other than the Insured Employee; and (3) not gainfully employed in any occupation for which the Insured Employee is or becomes qualified by education, training or experience." (AR 299). Hartford terminated its payment of LTD benefits based on its finding that plaintiff was capable of performing the substantial and material duties of his regular occupation as a Color Lab Chemist as of September 21, 2004.

Hartford's initial termination letter[4] of December 19, 2008, summarized medical

information from Drs. Neack and Chua, and concluded that such information did not support an

ongoing physical functional impairment. (AR 374). Hartford noted that plaintiff's frequency of

bowel movements was self-reported and plaintiff's ability to perform multiple household chores

and complete errands demonstrated an ability to function while being away from a bathroom.

The letter noted he could have worn protective undergarments. Hartford also noted that plaintiff

verbalized no reports of fecal incontinence at his last office visit in May 2005. (AR 374).

Hartford concluded that plaintiff was able to perform the duties of a Color Lab Chemist as of

September 21, 2004, and was therefore not disabled.

Plaintiff's subsequent appeal was denied by Hartford in its letter of September 28, 2009.

Again, Hartford concluded that the medical documentation did not support a functional

impairment that would have precluded plaintiff from performing the duties of his occupation

after September 20, 2004. (AR 365-67). Hartford noted the records it received from Dr.

Lawrence Neack:

> The records received from Dr. Lawrence Neack indicate that Mr. Rist was seen on
> 9/28/04 at which time Mr. Rist reported that he was having 3-4 bowel movements
> per day and sometimes more often with only 15 seconds to react.
>
> In a letter dated 10/12/04 Dr. Lawrence Neack indicated that Mr. Rist was
> disabled due to stool incontinence.
>
> According to the medical records Mr. Rist was seen by Dr. Neack on 3/11/05 with
> complaints of nausea and abdominal pain. Dr. Neack's assessment was
> abdominal pain and his HTN was stable. On 3/15/05 Mr. Rist was seen for a

---

4. Hartford's termination letters "should be the principal point of reference in [the Court's] review of a challenged denial of benefits." *University Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 849 n. 7 (6th Cir. 2000). *See also Heffernan v. UNUM Life Ins. Co. of America*, No. 1:97-cv-545, 2001 WL 1842465, at *4 (S.D. Ohio March 21, 2001) (Dlott, J.).

follow up and reported that he still had epigastric pain and acid reflux. Mr. Rist also reported that his loose stools were better.

On 3/21/05 Dr. Lawrence Neack indicated that Mr. Rist had colon cancer s/p resection 1993, diarrhea s/p resection 1993 and coronary artery disease. Dr. Neack also indicated that he did not feel that Mr. Rist would improve to the point that he could carry on normal work activities.

The records indicate that Mr. Rist was seen on 5/17/05 for epididymitis. Mr. Rist's blood pressure was 110/70 and his pulse was 72.

As part of the appeal review Mr. Rist's claim file was sent to MES Solutions for an Independent Medical Review. On 9/21/09 Albert C. Fuchs, M.D., Board Certified in Internal Medicine, indicated that based on his review of the medical information the medical records "do not support any medical problems that are/were causing functional impairment from 9/21/04 onward."

        \*\*\*

(AR 366). The termination letter also noted that while plaintiff was approved for Social Security disability benefits, Hartford and Social Security use different standards for determining disability. *Id.* Hartford concluded that its previous decision to terminate benefits was correct. (AR 367).

At the time his benefits were terminated on September 20, 2004, plaintiff was bound by the LTD Plan definition of Total Disability that he be "continuously unable to perform the substantial and material duties of the Insured Employee's regular occupation." After reviewing Hartford's decision *de novo* in light of all of the medical and other evidence in the administrative record, the Court concludes that Hartford was incorrect in its decision that plaintiff was not disabled from his regular occupation.

In the absence of any significant change in plaintiff's medical condition, the previous payment of disability benefits weighs against Hartford's decision to terminate plaintiff's LTD benefits in this case. Relevant to the Court's determination is whether a plan administrator terminates disability benefits in the absence of evidence showing medical improvement or an

explanation for the change from the previous finding of "disabled." *See Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2010) (finding decision to terminate benefits under these circumstances arbitrary and capricious). "[I]t is reasonable to require a plan administrator who determines that a participant meets the definition of "disabled," then reverses course and declares that same participant "not disabled" to have a reason for the change." *Morris v. American Electric Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010). The evidence fails to show any significant improvement in plaintiff's condition from the time plaintiff was initially granted long-term disability benefits in August 2003 by CNA to the time of the termination of his benefits by Hartford in September 2004 and thereafter such that plaintiff regained the ability to perform the substantial and material duties of his job as a Color Lab Chemist.

**1. Plaintiff was granted LTD in August 2003 based on bowel problems related to complications from cancer surgery and post-surgical treatment.**

After the surgical removal of one-half of plaintiff's colon, radiation, and chemotherapy following his cancer diagnosis in 1993, plaintiff returned to his occupation as a chemist for Imperial. He worked at this occupation for 10 years until his bowel and incontinence impairments deteriorated to the point that he was no longer able to perform the traveling required for the position. Nevertheless, his employer accommodated plaintiff's condition by giving him an in-house position with proximity to bathroom facilities. By February 2003, even that accommodation proved too little when plaintiff's medical condition deteriorated to the point where his employer was unable to make any accommodations for his return to work. (AR 522, 523).

32

Plaintiff then applied for and was granted disability benefits effective August 21, 2003, after he met the elimination period set forth in the LTD Plan. CNA, the Plan administrator at the time, based its disability decision on medical information from Dr. Chua, plaintiff's treating oncologist. Dr. Chua's office notes in December 2002, two months before plaintiff stopped working, state that plaintiff continued to have "his usual right upper quadrant discomfort and occasional diarrhea and gaseousness" and that he "continues to have these problems on a daily basis." (AR 681). Plaintiff had no evidence of recurrent colon cancer, but "because of his continued GI problems, which probably are related to complications from tumor, surgery, [and] radiation, his functional status is limited." *Id.* In April 2003, Dr. Chua's office notes indicate plaintiff continued with "persistent right-sided abdominal pain and diarrhea." (AR 682). His weight was stable and there was no evidence of recurrent colon cancer. He was to return in one year for his follow-up visit. *Id.*

In an April 2003 "Physician's Statement," Dr. Chua reported to CNA that plaintiff's diagnoses included colon cancer, irritable bowel syndrome, and short gut. (AR 717). His complications included post radiation enteritis (inflammation of the intestine) and symptoms of diarrhea, gaseousness, and incontinence. (AR 717). His medications included Lomotil and Ativan daily. *Id.* When asked about plaintiff's specific physical limitations (*i.e.,* lifting, standing, stooping), Dr. Chua reported, "Continued GI [gastrointestinal] problems R/T complication of surgery, radiation treatment limits functional status." (AR 718). His prognosis was listed as "not returning to work." *Id.*

33

In a Medical Assessment Tool dated July 2003, Dr. Chua reported that plaintiff's chronic medical conditions include persistent diarrhea with abdominal pain. (AR 688). Dr. Chua listed "dates of disability" as February 22, 2003 to "indefinitely."

At that time, plaintiff reported to CNA that he was able to cook, do laundry, do household chores like straightening up, dusting, and vacuuming, shop for one-half to one hour at a time, and spend only one hour away from home per day to shop. (AR 689-90). He reported he does not exercise because he has problems with irritation of his colon. (AR 690). He reported he had minimal control over his condition and that movement inflames his condition and scar tissue and decreases his productivity. (AR 691). Plaintiff's limitations were reported as "short gut–no bowel control, carries a bucket in the car, usually goes 30 seconds before he has to go, gets progressively worse, has scar pain–gets inflamed, has 1/2 colon removed, sees dr. 1 x yr." (AR 692).

Based on this evidence, CNA determined that plaintiff was unable to perform the substantial and material duties of his regular occupation and was therefore totally disabled as of August 2003.

**2. Following the termination of plaintiff's LTD benefits in September 2004, he still experienced the same bowel-related impairments.**

With the exception of the file review performed by Dr. Fuchs, the non-examining internist who was hired by Hartford, the medical and other evidence submitted by plaintiff shows little, if any, change in his condition subsequent to the grant of disability by CNA that would justify a termination of disability benefits. The basis of the original grant of disability benefits in 2003 was plaintiff's inability to perform the substantial and material duties of his job as a Color Lab Chemist due to a combination of pain, diarrhea, and incontinence which significantly

34

disrupted his ability to attend to his job duties because of the unpredictable nature of his bowel impairments. The medical records and reports submitted after plaintiff was initially granted disability benefits in August 2003 likewise establish that plaintiff continues to be totally disabled as defined by the LTD Plan.

Dr. Chua consistently reported an inability to work because of persistent abdominal pain, urgency and incontinence. In addition to the pre-August 2003 evidence from plaintiff's treating oncologist, a September 2003 report stated that Dr. Chua followed plaintiff on a yearly basis for "follow up & post treatment symptom management." (AR 672). Dr. Chua reported that plaintiff had "severe limitation of functional capacity; incapable of minimal (sedentary) activity (75-100%). (AR 672). Dr. Chua reported, "Impairment based on post treatment side effects and symptom management which is persistent right sided abdominal pain and diarrhea with severe and difficult urgency at times." *Id.* When asked about plaintiff's prognosis, Dr. Chua opined that plaintiff was totally disabled from his job and any other work, and that she did not expect a fundamental or marked change in the future because his "functional status is limited due to complications of treatment." (AR 673). Dr. Chua did not believe plaintiff was a suitable candidate for further rehabilitation services or that his present job could be modified to allow for handling with his impairment. *Id.*

In January 2004, Dr. Chua opined that plaintiff's symptoms of abdominal pain, diarrhea, bowel incontinence, gaseousness, and bowel urgency were credible and reasonably related to plaintiff's diagnoses and clinical signs. (AR 606). Dr. Chua reported that plaintiff experienced between two and twelve bowel movements per day with little or no "warning" on a typical basis. (AR 607). She reported that Ativan, prescribed in an effort to control urgency and diarrhea,

35

caused sedation as a side effect. (*Id.*). Dr. Chua opined that plaintiff would likely miss in excess

of three days of work per month due to the exacerbation of his bowel-related problems, and that

due to his severe bowel-related problems he would experience frequent exacerbations at work

which would cause his productivity to significantly diminish due to the need for unexpected

bathroom breaks. (*Id.*). Dr. Chua's reports do not show any improvement in plaintiff's condition

through January 2004.

Hartford contends that plaintiff cannot rely on Dr. Chua's reports as proof of continuing

disability for the period starting September 2004. (Doc. 27 at 10). The Court disagrees.

Although Dr. Chua's reports from 2003 and January 2004 pre-date the decision to terminate

plaintiff's LTD benefits effective September 21, 2004, they are certainly relevant to the decision

in this case. Dr. Chua's reports provide the baseline from which any "improvement" in

plaintiff's condition may be gauged. A comparison of Dr. Chua's reports to those of Dr. Neack

shows that plaintiff's condition has remained static over the relevant time period.

Like Dr. Chua, Dr. Neack consistently reported that plaintiff's bowel-related problems

significantly interfered with his ability to work. While Dr. Neack declined to complete

Hartford's "Functional Assessment Tool" form because, as an internist, he did not perform

functional capacity evaluations, Dr. Neack did provide Hartford with a narrative report. (AR

445). Dr. Neack reported in October 2004 that based on the frequency of plaintiff's bowel

movements, the urgency with which the condition manifests itself, and episodes of incontinence,

"it would be extremely difficult for anyone to perform employment duties with such an

uncontrolled problem." *Id.* Dr. Neack's office notes from September 2004 indicate plaintiff

experienced fecal incontinence, and that he had to "purge his system out to drive over here" to

attend the appointment. (AR 575). Dr. Neack reported that plaintiff has about 15 seconds to react to bowel urgency and while the number of bowel movements per day varied, he averaged between three to four movements per day. Doctor visits in March 2005 showed continued abdominal pain with nausea. (AR 574). Plaintiff reported "loose stools are better–more formed 1st BM of day–urgency still occurs with infrequent fecal incontinence." *Id.* In April 2005, Dr. Neack confirmed that plaintiff's condition and symptoms had not changed. (AR 592-595). Dr. Neack reported that plaintiff's symptoms of abdominal pain, diarrhea, bowel incontinence, gaseousness, and bowel urgency are credible, and that plaintiff experiences more than four bowel movements per day with little or no warning. Dr. Neack characterized plaintiff's pain, urgency, and frequency from his bowel related problems as "severe" and opined that plaintiff would likely miss in excess of three days of work per month due to the exacerbation of his bowel-related problems. Dr. Neack also reported that plaintiff's work productivity would significantly diminish due to his need for unexpected bathroom breaks and that he would experience frequent exacerbations of his combined bowel-related problems at work. (*Id.*).

Nevertheless, Hartford contends Dr. Neack's records actually show plaintiff's condition improved because there were no signs of dehydration, the office visit of March 15, 2005 noted loose stools were "more formed with infrequent fecal incontinence," and there was no mention of bowel problems when plaintiff was seen for a testicular infection in May 2005. (Doc. 72 at 8, citing AR 322). Hartford's arguments are not well-taken.

There is no indication that plaintiff experienced dehydration when he was initially found disabled in August 2003. Thus, whether or not he experienced dehydration in 2005 is not indicative of an improvement in plaintiff's medical condition.

Also, Hartford's partial citation to Dr. Neack's March 15, 2005 office note is misleading. The note actually states: "loose stools are better– *more formed 1st BM of day– urgency still occurs* with infrequent fecal incontinence." (AR 574). Even if plaintiff experienced some improvement in fecal incontinence, that fact does not negate plaintiff's other persistent symptoms which led to the initial disability determination. In addition, "improvement" is a relative concept. Hartford cites to a single office visit note to the exclusion of all of the other evidence from plaintiff's treating doctors which indicates his bowel-related problems remain disabling. Notably, Hartford ignores Dr. Neack's report the following month which places the "improvement" cited by Hartford in the context of plaintiff's overall functioning: plaintiff experiences more than four bowel movements per day with little or no warning; plaintiff's pain, urgency, and frequency from his bowel related problems are "severe" and would likely result in absenteeism from work in excess of three days per month; and frequent exacerbations of plaintiff's combined bowel-related problems at work would cause plaintiff's productivity to significantly diminish due to the need for unexpected bathroom breaks. (AR 592-595).

Hartford also cites to plaintiff's May 2005 office visit as evidence of improvement, noting plaintiff made no complaints about bowel symptoms at this visit. The fact that plaintiff was seen for treatment of a specific, unrelated condition (*i.e.,* a testicular infection) on one occasion, without mentioning bowel issues, does not mean his symptoms have improved, nor imply that he no longer experiences persistent bowel-related problems.

The opinions of Drs. Chua and Neack concerning the impact of plaintiff's bowel-related problems on his functional ability are consistent with and do not vary significantly from Dr. Chua's 2003 opinion that CNA relied upon in initially determining plaintiff was totally disabled.

38

This factor weighs against Hartford's finding that plaintiff was no longer disabled under the LTD

Plan as of September 21, 2004.

The only contrary physician opinion is from Dr. Fuchs, who never examined plaintiff and

who opined that plaintiff does not have *any* functional impairment as of September 21, 2004, and

that he was able "to function in any capacity without restrictions/limitations from that (sic)

onward." (AR 75). Dr. Fuchs stated:

> The claimant's colon cancer was resected in 1993. He completed radiation and
> chemotherapy in 1994. Since that time, regular oncologic follow up has not
> demonstrated evidence of recurrence. In addition, the claimant's irritable bowel
> syndrome is/was not documented to be causing functional impairment. Even if he
> was having diarrhea with stool incontinence, this would not preclude work with
> the use of appropriate protective undergarments. Moreover, in the last several
> years, the frequency of follow up does not support that his diarrhea and stool
> incontinence is a severe problem. Therefore, **no restrictions or limitations** are
> supported for the time period in question and the claimant's ability to work full
> time is **not limited by any medical problem**.

(AR 75) (emphasis added).

The reasons posited by Dr. Fuchs for his conclusion that plaintiff is not limited by any

medical problems are without substance. Dr. Fuchs stated that oncologic follow up has not

demonstrated evidence of recurrence of cancer. However, this was the status quo when plaintiff

was found to be totally disabled by CNA in 2003. In fact, plaintiff had not had a "recurrence" of

cancer since his 1993 surgery and radiation/chemotherapy treatment, but he was nevertheless

found totally disabled by CNA despite the lack of "recurrence."

In addition, Dr. Fuchs stated that plaintiff's diarrhea with stool incontinence would not

preclude work with the use of appropriate protective undergarments. However, this statement

ignores the frequency with which plaintiff would need to use the bathroom even if he soiled

himself. Nor does it account for the productivity issues noted by his treating physicians, Drs. Chua and Neack, who opined that plaintiff's productivity in the work place would significantly diminish due to unexpected bathroom breaks (whether or not he was wearing protective undergarments). In addition, and aside from the issue of incontinence, Dr. Fuchs failed to address the severity of plaintiff's other symptoms–abdominal pain, diarrhea, gaseousness, and bowel urgency–the combination of which would likely cause plaintiff to miss in excess of three days of work per month due to the exacerbation of such symptoms.

Finally, Dr. Fuchs opined that the frequency of follow up does not support plaintiff's claim of a severe medical problem. The frequency of doctor visits, while certainly relevant in determining the severity of many medical conditions, is but one consideration. Also relevant are "the plaintiff's condition at the time of [his] last doctor's visit, *the likelihood that additional doctor visits would have influenced the progression of [his] disability*, whether or not the plaintiff was taking medication or engaging in physical therapy or exercises recommended by [his] doctor, *and the need for a physician to directly monitor such activities in the normal course of treatment*." *Rowan v. Unum Life Ins. Co. of America*, 119 F.3d 433, 437 (6th Cir. 1997) (emphasis added). Over the more than fifteen years plaintiff has been living with his post-hemicolectomy condition, his doctors have prescribed various medications in an effort to ameliorate his symptoms of frequency and urgency. But the fact is his short gut condition is permanent. One-half of his colon has been removed and his treating doctors have consistently opined that the symptoms plaintiff experiences are directly related to the malabsorption of bile acids into the colon. Moreover, the frequency of plaintiff's medical visits is completely consistent with the underlying nature of his impairment and was no different for the time period

40

for which CNA determined he was disabled. His treating oncologist stated she followed him at one-year intervals for palliative treatment and control, both before and after he was found disabled. None of plaintiff's doctors has characterized plaintiff as a malingerer, nor have they opined that plaintiff's symptoms of incontinence, frequency, or urgency are not credible. In fact, two of his treating physicians have reported the opposite–that plaintiff's reported symptoms are credible. And while Hartford's initial denial letter appears to discredit plaintiff's doctors' conclusions about his condition because the frequency of plaintiff's bowel movements was "self-reported" (AR 374), Hartford points to no reason in the record for discounting or discrediting plaintiff's subjective reports of his bowel-related symptoms. *See Glenn v. MetLife*, 461 F.3d 660, 673 (6th Cir. 2006) (plan administrator's rejection of the treating physician's assessment based on the claimant's subjective complaints of stress was arbitrary because "the plan itself [did] not restrict the type of evidence that may be used to demonstrate total disability" and did not say that self-reported or "subjective" factors should be accorded less significance), *aff'd*, 554 U.S. 105 (2008).

Dr. Fuchs' report ignores the totality of the medical evidence and is the only physician opinion that is contrary to those of plaintiff's long-time treating physicians, who have limited plaintiff's functionality based on his well-documented, persistent, and serious bowel-related conditions. Although Hartford was not obligated to give deference to plaintiff's treating physicians' opinions over the opinions of its own consulting physician, *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003), "[b]y the same token, it may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn*, 461 F.3d at 671 (citing *Black & Decker Disability Plan,* 538 U.S. at 834). Hartford's conclusion that plaintiff

41

had absolutely no limitations on his ability to work based on Dr. Fuchs' review, in light of the
well-documented and long history of bowel-related symptoms resulting from plaintiff's status-
post hemicolectomy as set forth by his treating physicians, is not consistent with the quantity and
quality of the medical evidence in the record.

  In stark contrast to Dr. Fuchs' finding that plaintiff had no medical impairment
whatsoever that would limit his functional ability in any way, the Social Security Administration
found plaintiff disabled and granted him SSD benefits. The Social Security Administrative Law
Judge credited the opinions of Drs. Chua and Neack that plaintiff's frequent symptom-
exacerbations would severely interfere with his ability to perform full-time work and cause his
productivity to significantly diminish due to the need for unexpected bathroom breaks. (AR 92).
The Social Security Administration's disability decision is a "significant factor" in this Court's
consideration of Hartford's decision to terminate plaintiff's disability benefits. *Glenn*, 461 F.3d
at 669. *See also Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA
determination, though certainly not binding, is far from meaningless"). Even though a favorable
decision in a Social Security disability appeal does not make a claimant automatically entitled to
disability benefits under an ERISA plan:

> [i]f the plan administrator (1) encourages the applicant to apply for Social Security
> disability payments; (2) financially benefits from the applicant's receipt of Social
> Security; and then (3) fails to explain why it is taking a position different from the
> SSA on the question of disability, the reviewing court should weigh this in favor
> of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d 547, 554 (6th Cir. 2008). *See also DeLisle v.*
*Sun Life Assur. Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009). Where, as here, the standard

42

of review is *de novo*, a finding of all three factors weighs all the more heavily against the administrator's decision.

Here, the plan administrator "suggested" plaintiff apply for Social Security disability benefits. (AR 692). Plaintiff signed a formal agreement acknowledging CNA's right to offset his LTD benefits by Social Security benefits and his obligation to repay any overpayment of LTD benefits resulting from a later award of Social Security benefits. (AR 683). Hartford was given a copy of the Social Security decision finding plaintiff disabled, but in its termination letter Hartford failed to explain why it reached a conclusion contrary to that of the Social Security Administration's finding of disability, except to say that the standards for determining disability under the Plan and for Social Security are "different." The "mere mention of the [Social Security] decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA." *Bennett,* 514 F.3d at 553, n.2. All three *Bennett* factors weigh against Hartford's decision to terminate plaintiff's benefits.

Nevertheless, Hartford argues the Social Security decision actually supports Hartford's decision to terminate benefits because, according to Hartford, "in fact, the SSA did not find that Rist was disabled. Instead, it found he met the 'non-disability' requirements for benefits" and concluded he "could work full-time, with some restrictions." (Doc. 72 at 7). Hartford cites to the

43

Administrative Law Judge's (ALJ) residual functional capacity (RFC)[5] finding and draws the conclusion that plaintiff can "work full-time."

Hartford's argument displays a misunderstanding of the Social Security disability process and the basis for the SSA's disability finding. An RFC is an assessment of what a claimant can do despite his or her impairments and limitations, not a finding that an individual can "work full-time." *See* 20 C.F.R. § 404.1545(a)(1); Social Security Ruling 96-8p. The RFC assessment is used at step 4 of the sequential evaluation process[6] to determine whether an individual is able to do past relevant work and at step 5 of the process to determine whether an individual is able to do other work, considering his or her age, education, and work experience. SSR 96-8p.

The fact the ALJ found that plaintiff was unable to perform his past relevant work given his RFC indicates plaintiff cannot "work full-time" as a Color Lab Chemist. Because the ALJ's RFC finding includes standing and lifting abilities consistent with plaintiff's past work as a chemist, plaintiff's inability to perform his past work is necessarily based on the RFC findings

------

5. The ALJ determined that plaintiff has the following RFC:

[T]he undersigned finds that the claimant has the residual functional capacity to lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds frequently and stand and/or walk six hours in an eight-hour workday. The claimant can occasionally stoop, kneel, crouch, crawl, climb ladders/ropes/scaffolds, ramps and stairs. His job must accommodate absences from work of three days per month and restroom breaks during the workday of five-minutes each, four to six times per workday on an unscheduled basis.

(AR 91).

6. The Social Security Administration utilizes a five-step sequential evaluation process in determining disability: (1) whether a claimant is engaging in substantial gainful activity, (2) whether he has a medically determinable "severe impairment," (3) whether that impairment met or equaled the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4, (4) whether his residual functional capacity allowed him to perform "past relevant work," meaning the work performed during the past 15 years either as the claimant actually performed it or as it is generally performed in the national economy, and (5) whether he is able to do any other work, and whether the SSA has provided evidence that other work exists in significant numbers in the national economy that he can do, given his residual functional capacity, age, education and work experience. *See* 20 CFR § 404.1520(a); (AR 89-90).

relating to absenteeism and unscheduled bathroom breaks. (AR 92). There is no meaningful

distinction between impairment-related absenteeism and functional limitations. *See Harmon v.*

*Astrue,* No. 5:09cv2765, 2011 WL 834138, at *4 n.1 (N.D. Ohio Feb. 8, 2011) (RFC finding

assesses what a claimant can do despite his or her impairments and must necessarily include

claimant's ability to attend work). *See also Hitte v. Com'r of Social Sec.*, No. 1:08-cv-295, 2010

WL 987027, at *3 (S.D. Ohio March 15, 2010) (absences of two times per month on average

would not be tolerated by employer); *Dunigan v. Commissioner of Social Sec.,* No.

1:08-CV-00501 2009 WL 2579641, at *5 (S.D. Ohio Aug. 18, 2009) (employers will not tolerate

absences in excess of one day per month). The issue is not whether plaintiff has the exertional

capacity to perform the lifting and standing requirements of his former job. Rather, the issue is

whether plaintiff's bowel-impairments are such that they preclude an ability to regularly perform

the duties of his job without significant interruption. Hartford's assertion that SSA found

plaintiff could work full-time with restrictions is without merit.

Finally, Hartford contends that it appropriately considered plaintiff's self-reported

activities, which purportedly were inconsistent with his claimed inability to return to work. Yet,

plaintiff's activities of daily living were essentially comparable to his activities in 2003 when he

was granted long-term disability benefits by CNA. In September 2004, plaintiff did household

chores, such as dusting, cleaning, washing dishes, vacuuming and laundry. He was able to ride

his riding lawnmower to mow his grass. (AR 174). He reported he had to purge his system and

take Lorazepam before he went away from his house. *Id*. He did not think he could do even a

sedentary type job because of the loss of bowel control and urgency, which gave him about a 30-

second warning before he need to use the bathroom. *Id*. These activities largely duplicate

plaintiff's activities in 2003 when he was found disabled. His reported activities in September 2004 do not provide a reasoned basis for Hartford's termination of disability benefits.

In sum, the medical and other evidence in the administrative record demonstrate that plaintiff's condition remained largely unchanged from the time of his initial disability determination in 2003. Following the initial finding of disability by CNA, plaintiff continued on a regimen of medications prescribed by his physicians for his bowel-related condition. It is reasonable that plaintiff, who had been suffering from the same, persistent bowel-related symptoms for over fifteen years and maintaining the same medication regimen, would not require frequent office visits or the direct monitoring of his bowel functions by a physician. Plaintiff received regular colonoscopies and panendoscopies from Dr. Decktor to monitor the recurrence of colon cancer and other colon-related issues, and his level of treatment appears to be wholly appropriate in light of his static medical condition. Hartford possessed the right to examine plaintiff before terminating his benefits, but chose not to. Despite the consistent evidence from plaintiff's treating physicians that plaintiff's bowel-dysfunction prevents him from engaging in full-time work, Hartford instead relied on the opinion of a non-examining physician who pointed to no objective test results or other medical documentation to refute the conclusions reached by Drs. Chua and Neack. Though the Court is not bound by the opinions of the treating physicians, in the absence of any reasoned explanation by Hartford as to why plaintiff's condition was disabling from August 2003 until September 20, 2004, but not thereafter when his condition remained static and no other evidence demonstrates any significant change in his condition which would warrant a termination of benefits, the Court finds that Hartford wrongfully terminated plaintiff's LTD benefits in this case.

46

## C. Application of Arbitrary and Capricious Standard to Life Insurance Policy

There is no dispute that Hartford's decision to terminate the life insurance waiver of premium benefit is subject to the arbitrary and capricious standard of review. Under the arbitrary and capricious standard of review, this Court must determine whether Hartford's termination decision "is the result of a deliberate, principled reasoning process and . . . is supported by substantial evidence." *Glenn*, 461 F.3d at 666 (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). The Court must determine whether Hartford's decision was rational in light of the provisions of the life insurance policy. *McDonald v. Western- Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003); *Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000). The plan administrator's decision will be upheld if the administrative record can support a "reasoned explanation" for the decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (citing *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). The "explanation must be consistent with the quantity and quality of the medical evidence that is available on the record." *Moon*, 405 F.3d at 381 (internal quotation and citation omitted).

The arbitrary and capricious standard of review is not a mere rubber stamp of the plan administrator's decision. *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 508 (6th Cir. 2009); *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). As the Sixth Circuit in *McDonald* stated:

[T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently

47

> includes some review of the quality and quantity of the medical evidence and the
> opinions on both sides of the issues. Otherwise, courts would be rendered to
> nothing more than rubber stamps for any plan administrator's decision as long as
> the plan was able to find a single piece of evidence--no matter how obscure or
> untrustworthy--to support a denial of a claim for ERISA benefits.

347 F.3d at 172. "Deferential review is not no review, and deference need not be abject." *Id.*

(internal quotation and citation omitted).

Hartford terminated plaintiff's waiver of premium benefit under the life insurance policy

because it determined plaintiff was no longer disabled. The life insurance policy defines "Total

Disability" to mean that "as a result of injury or sickness, You are unable to perform each of the

material duties of any Gainful Occupation." (AR 069). "Gainful Occupation" is defined as "the

performance of any occupation or employment for wages, remuneration or profit, for which You

are reasonably qualified by education, training or experience." (AR 068). Hartford concluded

that the medical documentation did not support the existence of a functional impairment that

would preclude plaintiff from performing the duties of any gainful occupation for which he may

be qualified after September 20, 2004. (AR 17). Hartford adopted the identical rationale for the

termination of the waiver of premium benefit as it used for the termination of plaintiff's LTD

claim. (AR 16-18).

After review of the administrative record in this case, the Court determines that Hartford

failed to provide a reasoned explanation consistent with the quantity and quality of the medical

evidence in the record for its decision to terminate plaintiff's waiver of premium benefit under

the life insurance policy. The Court concludes that Hartford's termination of plaintiff's waiver of

premium benefit was arbitrary and capricious based on the following reasons.

First, Hartford's rationale for terminating plaintiff's benefits omits any comparison of plaintiff's post-September 2004 condition to his condition in 2003 when he was found disabled by CNA. *See Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2010). As set forth above in the Court's discussion of the LTD Plan, Hartford failed to explain how plaintiff's medical condition improved after the 2003-2004 time period for which he was found disabled. Hartford made no effort to compare plaintiff's condition in 2003 when he was found disabled to his condition as it existed in September 2004 and thereafter. Hartford argues that neither Dr. Chua nor Dr. Decktor offered an opinion on plaintiff's disability subsequent to September 2004. Even so, their earlier reports and records are clearly relevant to the decision whether to terminate disability benefits in this matter. These physicians' reports provide the underlying medical basis for plaintiff's bowel-related problems and provide the frame of reference for judging any improvement or change in plaintiff's condition and functioning, which Hartford failed to consider in terminating plaintiff's benefits. Dr. Neack's reports, when viewed in conjunction with those of Dr. Chua, show a static medical condition over the relevant time period. Hartford's assertion that Dr. Neack's 2005 assessment of plaintiff's functioning is inconsistent with his March and May 2005 office notes is without merit for the reasons noted above in connection with the discussion of the LTD Plan. Hartford's failure to offer a reasoned explanation why the opinions of plaintiff's treating physicians were incorrect or not worthy of credence weighs against Hartford in determining whether its termination of benefits was arbitrary and capricious. *Moon*, 405 F.3d at 379.

The only contrary physician opinion is from Hartford's reviewing physician, Dr. Fuchs, who never examined plaintiff and who, incredibly, opined that plaintiff had no medical problems

49

causing any functional impairment. As detailed above, Dr. Fuchs' "reasons" for finding plaintiff suffered from no impairment whatsoever that would impact his ability to work lack substantial support in the record. *Cf. Glenn*, 461 F.3d at 666 (requiring decision to be supported by substantial evidence). The Court is mindful that when a plan administrator chooses to accept the opinion of one physician over that of another, generally the administrator's decision cannot be said to be arbitrary and capricious "because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169. However, "that rule is not absolute." *Elliot v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 621 n.6 (6th Cir. 2006). Where, as here, the quality and quantity of the record evidence fails to provide substantial support for Dr. Fuchs' opinion, Hartford's termination decision is not entitled to deference. *McDonald,* 347 F.3d at 172.

Second, plaintiff's reported activities were not substantially different in 2004 in comparison to those in 2003 when he was determined to be totally disabled. Despite Hartford's assertions that plaintiff did not report carrying a bucket in his car in 2004 as he did in 2003 and that he operated a riding lawn mower in 2004 to cut his grass (Doc. 74 at 3), these activities do not show significant improvement in his medical condition such that he was no longer disabled.

Third, Hartford, as administrator and payor, has a conflict of interest which the Court considers as one factor in reviewing Hartford's decision to terminate benefits under the arbitrary and capricious standard. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). Where, as here, Hartford "is authorized both to decide whether an employee is eligible for benefits and to pay those benefits[,][t]his dual function creates an apparent conflict of interest." *Glenn*, 461 F.3d at 665-66. The conflict of interest occurs because the company incurs a direct

50

expense as a result of the allowance of a claim and benefits directly from the denial or

discontinuation of a claim. *Killian v. Healthsource Provident Administrators*, 152 F.3d 514, 521

(6th Cir. 1998). A conflict of interest "should prove more important (perhaps of great

importance) where circumstances suggest a higher likelihood that it affected the benefits

decision. . . ." *Metropolitan Life Ins. Co.*, 554 U.S. at 117.

 The existence of a conflict of interest is one factor weighing against Hartford in its

decision to terminate plaintiff's long-term disability benefits. This is especially true where the

initial decision to grant disability benefits was made by CNA, and Hartford, as the successor

administrator, failed to show any material improvement in plaintiff's medical condition

subsequent to the initial grant of disability benefits by CNA. This factor persuades the Court that

Hartford was likely influenced by its financial interest in terminating plaintiff's benefits.

Moreover, Hartford's seemingly inconsistent positions on plaintiff's claim for Social Security

benefits, as explained below, justifies giving more weight to the conflict of interest created by

Hartford's dual roles in this case. *See Metropolitan Life Ins. Co.*, 554 U.S. at 118.

 Fourth, Hartford's treatment of the Social Security Administration's decision granting

disability benefits to plaintiff further persuades the Court that Hartford's decision in this case was

arbitrary and capricious. Hartford failed to discuss any substantive reasons for reaching a

decision contrary to that of the SSA. Hartford's statement that it uses a "different definition of

disability" hardly qualifies as any meaningful discussion of the SSA's decision. *See Bennett*, 514

F.3d at 553 n.2. Hartford required plaintiff to apply for Social Security disability benefits and to

reimburse it for any benefits granted; yet, Hartford never explained why its decision is different

from that of SSA's on the question of disability. *Id.* at 554. *See also Holler v. Hartford Life and*

51

*Accident Ins. Co.*, 737 F. Supp.2d 883, 891 (S.D. Ohio 2010) (Black, J.). This factor also weighs in favor of a finding that Hartford's decision to terminate plaintiff's benefits was arbitrary and capricious.

In conclusion, Hartford's decision terminating benefits to this long-term employee is highly suspect. As discussed above, Hartford was operating under a conflict of interest because it both determined eligibility and paid the benefits. Hartford failed to offer any reasoned explanation for its apparent conclusion that plaintiff's medical condition had significantly improved such that he was no longer disabled, contrary to the clear and explicit findings of his treating doctors and the Social Security Administration. Instead, Hartford chose to rely on the opinion of a non-examining reviewing physician to terminate benefits. Taking all of these factors into consideration, the Court concludes that Hartford's decision to terminate plaintiff's waiver of premium benefit under the life insurance policy was arbitrary and capricious.[7]

## IT IS THEREFORE RECOMMENDED THAT:

1. Plaintiff's motion for judgment on the administrative record (Doc. 71) be **GRANTED**.

2. Hartford's motion for judgment on the administrative record (Doc. 69) be **DENIED**.

3. This matter be remanded for an award of benefits.

Date: 4/18/2011

Karen L. Litkovitz
United States Magistrate Judge

---

7. In view of the Court's findings that Hartford's decisions to terminate plaintiff's benefits under both the LTD Plan and life insurance policy should be reversed, the Court need not reach plaintiff's alternate argument that Hartford violated ERISA's procedural requirements when it "suspended" or cancelled plaintiff's benefits as of September 2004. (Doc. 71 at 22-23).

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHRISTOPHER RIST,
     Plaintiff,

    vs.

THE HARTFORD LIFE AND
ACCIDENT INSURANCE CO., et al.,
    Defendants.

Civil Action No. 1:05-cv-492
Dlott, J.
Litkovitz, M.J.

### NOTICE TO PARTIES REGARDING FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).